## HUNYADI JANOS CORPORATION v. STOEGER.

(District Court, S. D. New York. March 24, 1925.)

1. War ⬤⟶12—Legal effect of conveyance of alien enemy's property by Alien Property Custodian is same as conveyance by alien owner.

Where American business, labels, good will, trade-marks, etc., of Hungarian concern were seized and sold by Alien Property Custodian under Trading with the Enemy Act Oct. 6, 1917, § 7, subsec. (c), as amended by Act Nov. 4, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 3115½d), legal effect of sale was same as if it had been made by alien owner exclusively to purchaser.

2. Trade-marks and trade-names and unfair competition ⬤⟶88 — Purchaser from Alien Property Custodian held entitled to enjoin use of trade-mark on, imported water on which formerly used.

Purchaser from Alien Property Custodian under Trading with the Enemy Act Oct. 6, 1917, § 7, subsec. (c), as amended by Act Nov. 4, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 3115½d), of American business, labels, good will, trade-marks, etc., of enemy aliens who distributed mineral water from Hungarian wells owned by them, held entitled to enjoin continued use of trade-marks on water imported from Hungarian concern, where American business prior to such sale had been extensive enough to have good will separate from good will appurtenant to wells.

3. Trade-marks and trade-names and unfair competition ⬤⟶85(2)—Purchaser of business, trade-marks, etc., of enemy alien from Alien Property Custodian held not to have used trade-marks to deceive public.

That purchaser from Alien Property Custodian under Trading with the Enemy Act Oct. 6, 1917, § 7, subsec. (c), as amended by Act Nov. 4, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 3115½d) of trade-mark, etc., of American business belonging to enemy aliens who distributed mineral water from Hungarian wells, used such trade-mark as its corporate name, and stated in its labels that it was owner of business formerly conducted by aliens, held not deception of public in violation of Trade-Mark Act, § 21 (Comp. St. § 9506), so as to prevent protection of trade-mark by injunction.

In Equity. Suit by the Hunyadi Janos Corporation against Alexander F. Stoeger. Decree for plaintiff.

Harry D. Nims and Minturn de S. Verdi, both of New York City, for plaintiff.

Briesen & Schrenk, Hans V. Briesen, and Fred A. Klein, all of New York City, for defendant.

BONDY, District Judge. This is a suit to restrain the infringement of trade-marks registered in the Patent Office of the United States, which were seized and transferred to plaintiff's assignor by the Alien Property Custodian, acting under the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j).

Prior to the war between the United States and Austria-Hungary, Andreas Saxlehner and his successors bottled, and sold throughout the United States and elsewhere, under the name of Hunyadi Janos, mineral water from wells in the neighborhood of Budapest owned by them. They used in the United States a label bearing their trade-mark "Hunyadi Janos" and a picture of the head of a knight.

In the course of time Andreas Saxlehner registered the trade-mark "Hunyadi Janos" in the Patent Office of the United States, and he and his successors maintained in the United States a place of business from which they distributed to buyers in the United States and other countries their mineral waters and also pills, which were manufactured for them in the United States and sold by them under their trade-mark "Hunyadi Janos."

When war was declared between the United States and Austria-Hungary, this business of importing and selling mineral water in the United States was being conducted in the name of Andreas Saxlehner at 130 Fulton street, in New York City. Goods were shipped and bills rendered from there and payments were received there.

On December 21, 1918, the Alien Property Custodian of the United States, acting under the provisions of the Trading with the Enemy Act, demanded and seized the business of the firm of Andreas Saxlehner, all its tangible and intangible assets, trade-marks, trade-names, and good will as the property of an alien enemy resident in Budapest, Hungary.

On December 24, 1918, the Alien Property Custodian filed a copy of the demand and notice of the seizure of the property in the office of the Commissioner of Patents, and sold as a going concern the business thereto-

fore conducted under the trade-name of Andreas Saxlehner, at 130 Fulton street, New York, and elsewhere in the United States, including its office furniture, fixtures, pills, labels, good will, trade-names, and trademarks to the Partola Manufacturing Company, which on May 19, 1919, transferred the same to the plaintiff, a corporation existing under the laws of the state of New York.

The defendant, a citizen of New York, now imports mineral water bottled by the firm of Andreas Saxlehner in Hungary, and sells this water under the name of "Hunyadi Janos" and "Andreas Saxlehner" in bottles which bear labels similar in every detail to those above described.

The plaintiff asks that the defendant be enjoined from importing and selling any bitter water under the name of Hunyadi Janos, or the name Andreas Saxlehner, or under any colorable imitation of plaintiff's label, and from doing anything which may tend to destroy or impair the rights, trademarks, property, or good will seized by the Alien Property Custodian.

In Bourjois & Co., Inc., v. Katzel, 275 F. 539, the Circuit Court of Appeals held that the importation and sale in the United States by a third person of a face powder made in France, bearing the trade-mark under which it is sold in France and also in this country, is not an infringement of the American trade-mark on the same imported powder, acquired by an American from the French manufacturer, even assuming that it would be a breach of its obligation, if the French manufacturer sold the powder in this country under that mark. The court held that because the third person bought the face powder in France and herself imported it into this country and sold it in the boxes in which she purchased the powder, she did not infringe the American trade-mark.

Following that decision, the Circuit Court of Appeals affirmed an order denying the application of the complainant in the suit under consideration for a · preliminary. injunction against the defendant, and in so doing the Circuit Court said: "If we assume for the purposes of the argument that the plaintiff obtained a good title to the business in this country of the firm of Andreas Saxlehner in Hungary and owns here the trade-marks claimed, nevertheless as the defendant purchased the water in Europe and it is the genuine Hunyadi Janos water, and he is offering it to the trade in the same form in which he imported it and the labels were affixed to it by the firm of Andreas Saxlehner

in Budapest we see no distinction in principle between this case and the Bourjois Case." Hunyadi Janos Corporation v. Stoeger, 285 F. 861.

Subsequently the United States Supreme Court reversed the decision of the Circuit Court of Appeals in the Bourjois Case, and held that the fact that the powder was the genuine product of the French concern, and that it was contained in boxes of the French concern, bearing its trade-mark, did not give the defendant the right to sell the powder in such boxes in the United States after the French concern had sold to the complainant its trade-marks, business, and good will in the United States. Bourjois & Company v. Katzel, 260 U. S. 689, 43 S. Ct. 244, 26 A. L. R. 567.

As was pointed out by the Circuit Court of Appeals on the application for a preliminary injunction in this suit, it did not deem it necessary to inquire whether the plaintiff acquired legal title to the trade-marks through the sale by the Alien Property Custodian, because assuming it had the legal title, the defendant could import and sell an article made in a foreign country and bearing the trade-mark under which it is sold in that country, and also in this country, without infringing the American trade-mark on the same imported article.

The Trading with the Enemy Act of Oct. 6, 1917, § 7, subsec. (c), as amended by Act of November 4, 1918, ch. 201, § 1 (Comp. St. Ann. Supp. 1919, § 3115½d), provides that if the President shall so require, any property, including patents, copyrights, trade-marks, and rights and claims of every character and description belonging to an enemy or ally of an enemy not holding a license granted by the President, which the President after investigation shall determine so belongs, may be seized by the Alien Property Custodian, and that any requirement made pursuant to the act, or a duly certified copy thereof, may be filed, registered, or recorded in the proper office for the filing, registering, or recording of conveyances, transfers, or assignments of patents, copyrights, or trade-marks, or any rights therein, and if so filed, registered, or recorded, shall impart the same notice and have the same force and effect as a duly executed conveyance, transfer, or assignment to the Alien Property Custodian so filed, registered, or recorded.

The defendant contends that the trade-marks were inseparable from the product of the natural springs or wells in Hungary, and therefore could not be conveyed without

the wells to which they were appurtenant, and that therefore they could not be seized and transferred by the Alien Property Custodian, and that the sale by him effected at most a transfer of the tangible property in the New York selling office and of the right to dispose of the merchandise there on hand under trade-marks appurtenant thereto.

The plaintiff contends that the Alien Property Custodian seized the business and the good will of the business carried on in the United States, and that the trade-marks and trade-names were appurtenant to the business carried on in the United States.

In its opinion on the application for a preliminary injunction herein the Circuit Court of Appeals said: "If the firm of Andreas Saxlehner in Hungary had transferred along with its trade-mark its American business exclusively to the New York firm and had thereafter undertaken to compete with the latter by exporting its water to the United States for sale here, its conduct would have afforded a ground for equitable jurisdiction. See Appollinaris Co. v. Scherer (C. C.) 27 F. 18, 20; A. Bourjois & Co. v. Katzel (C. C. A.) 275 F. 539, 542."

[1] The seizure of the American business of Andreas Saxlehner by the Alien Property Custodian and its transfer by him did have the same legal effect as if Saxlehner had transferred his American business with its good will and trade-marks exclusively to the New York firm, or its assignor.

In Koppel v. Orenstein (C. C. A.) 289 F. 446, Judge Manton said:

"It was the apparent intention of Congress to sell enemy property as fully as the owner thereof could sell. This was deemed necessary as a war measure. In the case of a going concern, which owned the good will or trade-marks, it was clearly intended that these concerns should be kept going in order to engage in manufacturing or other enterprises which might be needed for the welfare of our country during this period; and it had the other purpose of crippling the enemy to the extent of preventing the enemy from enjoying its property or its profits during such period. Likewise, it was the intention of Congress that the American citizen, who was authorized to purchase at public sale, should, if the terms of sale so provided, be able to buy and enjoy his purchase as a going concern, thereby obtaining all that the German proprietorship consisted of at the time of sale. The language of the Trading with the Enemy Act clearly embraces this power of sale. To permit of the sale of the physical property only would

have deprived the purchaser in the instant case of the great value of the good will of the German corporation, which had made its business and its growth during the preceding years. The conveyance by the bill of sale as referred to, conveyed 'the business as a going concern and the good will,' together with 'all registered and unregistered trade-marks * * * trade-names and the like,' and 'all privileges, franchises, and rights of every kind,' owned by the German corporation and its subsidiaries in the United States. We think this conveyed to the purchaser the exclusive right to carry on the business in the United States, with the right of protection of a court of equity from interference by the German corporation; for, if the present interference be permitted, what was conveyed would in time be destroyed. The sale was as complete as if it were a voluntary conveyance of its interests in the United States by the German corporation. It is not the case of a sale in invitum of the good will and business. Assuming a voluntary sale of its good will and business had been made by the German corporation, would it have been at liberty later to impair the good will by seeking the customers of the buyer and carrying on business, using substantially the same trade-name and trade symbol as they had theretofore used? We think not."

In the Bourjois Case the United States Supreme Court expressly refers to the fact that the labels have come to be understood by the public here as meaning goods coming from the plaintiff who bought the powder in bulk and repacked it in the United States.

In the Koppel Case the product sold by an alien enemy in the United States, and seized by the Alien Property Custodian, was manufactured in factories in the United States. The trade-mark affixed to the product, although the trade-mark of an alien, indicated a product coming from a factory in the United States.

[2] In the case under consideration, the evidence that the names Saxlehner and Hunyadi Janos were associated in the United States with a business carried on in New York, rather than with a mineral water having its origin in Hungary, is not very satisfactory. It seems, however, sufficient has been proved to establish that the aliens carried on the business of importing and selling Hunyadi Janos water, and of manufacturing and selling Hunyadi Janos pills, in the United States extensively enough to create good will in connection with their

business in the United States, and that a sale of their business, its good will, and its trade-marks did transfer the trade-marks, not as appurtenant to the wells, but as appurtenant to the business carried on in America and sold by the Alien Property Custodian.

The Circuit Court of Appeals seems to have been of that opinion when it stated that if the firm of Andreas Saxlehner had transferred along with its trade-marks its American business exclusively to the New York firm, and had thereafter undertaken to compete with the latter by exporting its waters to the United States for sale here, it would have afforded ground for equitable jurisdiction.

[3] The defendant contends that the bill should be dismissed because the trade-mark has been used with a design of deceiving the public in the purchase of merchandise. Trade-Mark Statute, § 21 (Comp. St. § 9506).

The fact that the plaintiff is doing business under the name of Hunyadi Janos Corporation, and that the plaintiff on a label announces that it is the owner of the firm of Andreas Saxlehner, does not justify defendant's contention that the plaintiff thereby represents itself as the owner of the wells or as identified with the firm of Andreas Saxlehner. This is so in view of the fact that Andreas Saxlehner and his successors, besides selling mineral water, also manufactured in the United States and sold, under the name of Hunyadi Janos, pills made of chemicals, none of which was derived from Hunyadi Janos water, and in view of the fact that plaintiff affixed to the bottles containing the Hunyadi water sold by it a notice that in the United States the trade-mark Hunyadi Janos is the property of and may be used only in connection with the business formerly carried on at 130 Fulton street, New York, by Andreas Saxlehner, which business plaintiff now owns, and any person selling mineral water in the United States under the name Hunyadi Janos, which does not bear this neck label, shall be prosecuted to the full extent of the law.

The facts do not convince the court that the mark, or the name Hunyadi Janos Corporation has been used by the plaintiff with a design of deceiving the public in the purchase of the water. See Jacobs v. Beecham, 221 U. S. 263, 273, 31 S. Ct. 555, 55 L. Ed. 729.

The infringement of plaintiff's trade-mark, therefore, must be enjoined.